Michael R. Lozeau (State Bar No. 142893)
E-mail: michael@lozeaudrury.com
Rebecca L. Davis (State Bar No. 271662)
E-mail: rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

[Additional Counsel on following page]

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a California nonprofit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>CITY OF LOMPOC, a California municipality,<br><br>        Defendant. | Case No. 2:21-cv-1714<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT                                           1

Linda J. Krop (State Bar No. 118773)
E-mail: lkrop@ environmentaldefensecenter.org
Margaret M. Hall (State Bar No. 293699)
E-mail: mhall@environmentaldefensecenter.org
Tara C. Messing (State Bar No. 307670)
E-mail: tmessing@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel: (805) 963-1622

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

ENVIRONMENTAL DEFENSE CENTER ("EDC" or "Plaintiff"), a California nonprofit corporation, brings this action to enforce the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act") and its implementing regulations against the CITY OF LOMPOC ("City" or "Defendant") regarding ongoing violations caused by the City's municipal wastewater collection, treatment, and disposal facility's ("Facility") failure to comply with the terms and conditions of its National Pollution Discharge Elimination System ("NPDES") Permit. The Facility has and continues to discharge water contaminated with toxic pollutants, dissolved solids, and other pollutants into San Miguelito Creek and the Santa Ynez River at levels exceeding numeric effluent and receiving water limitations. The City's discharges have and continue to cause harm to the waters downstream of the Facility, including ecologically sensitive areas that include essential habitat for dozens of fish and bird species. In addition to the City's violations of numeric standards, the City has committed procedural violations by failing to develop, implement, and enforce a pretreatment program that complies with the Clean Water Act.  The City's violations of these substantive and procedural requirements of the Clean Water Act and the City's NPDES Permit are ongoing and continuous.  Accordingly, Plaintiff, by and through its counsel, hereby alleges as follows:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Clean Water Act. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United

States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On September 11, 2020, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of EDC's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. On September 2, 2020, the EPA entered into an Administrative Order on Consent ("AOC") with the City regarding the Facility's ongoing violations of the Clean Water Act, however the AOC does not address all of the claims raised in this action. Moreover, the AOC does not assess any civil penalties against the City.  Therefore, this action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.     This complaint seeks relief from Defendant's discharges of polluted water from the City of Lompoc Regional Wastewater Reclamation Plant located at 1801 West Central Avenue in Lompoc, California ("Facility").  The Facility is a publicly owned treatment works ("POTW") facility, owned and operated by the City. These discharges, effluent and receiving water violations, related monitoring and reporting omissions, and the City's failure to develop, implement, and enforce an adequate pretreatment program are violations of the Act and NPDES Permit No. CA0048127, *Waste Discharge Requirements for the City of Lompoc Regional Wastewater Reclamation Plan*t, Order No. R3-2011-0211  ("NPDES Permit"). Defendant's violations of these substantive and procedural requirements of the NPDES Permit and the Act are ongoing and continuous.

6.     The City has repeatedly discharged effluent resulting in chronic toxicity in excess of the numeric limitations set forth in the NPDES Permit. Likewise, the City has failed in its obligation to conduct proper follow-up monitoring, to determine the root cause behind the violations, and remedy the same.

7.     In addition, the City has repeatedly discharged levels of sodium, chloride, and total dissolved solids ("TDS") in excess of the NPDES Permit's numeric effluent and receiving water limitations and remains likely to continue doing so in the future.

8.     The City of Lompoc has also failed to develop, implement, and enforce a

pretreatment program that complies with the Clean Water Act.

9.     Waters downstream of the Facility are ecologically sensitive areas and are essential habitat for dozens of fish and bird species, including the endangered Southern California steelhead and threatened Western snowy plover, as well as macro-invertebrate and invertebrate species. Effluent water contaminated with toxic pollutants, dissolved solids, and other pollutants harms the special aesthetic and recreational significance that San Miguelito Creek and the Santa Ynez River have for people in the surrounding communities.  Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into San Miguelito Creek and the Santa Ynez River.

## III.   PARTIES

10.     Plaintiff ENVIRONMENTAL DEFENSE CENTER is a 501(c)(3) nonprofit public benefit corporation organized under the laws of the State of California with its main office in Santa Barbara, California. Founded in 1977, EDC has more than 2,000 members, and works primarily in Ventura, Santa Barbara, and San Luis Obispo Counties. EDC and its members are deeply concerned with protecting the environment in and around their communities, including San Miguelito Creek and the Santa Ynez River. To further these goals, EDC protects and enhances the local environment through education, advocacy, and legal action.  Specifically, EDC focuses on clean water, open space and wildlife, and climate and energy.

11.     EDC has members living near San Miguelito Creek and the Santa Ynez River in Santa Barbara County, and who regularly use and enjoy these waters and surrounding areas for recreational, scientific, and academic activities, including but

not limited to hiking, kayaking, boating, fishing, bird watching, wildlife viewing, and/or engaging in scientific study.

12.     Members of EDC use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Defendant's discharges of pollutants threaten or impair each of the uses described above, or contribute to such threats and impairments. Thus, the interests of EDC's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the NPDES Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

13.     EDC brings this action on behalf of its members. EDC's interest in reducing Defendant's discharges of pollutants into San Miguelito Creek and the Santa Ynez River, and requiring Defendant to comply with the requirements of the NPDES Permit, are germane to its purposes. Litigation of the claims asserted, and relief requested, in this Complaint does not require the participation in this lawsuit of individual members of EDC.

14.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy, or adequate remedy at law.

15.     EDC is a "citizen" as defined in 33 U.S.C. § 1365(g) and a "person" as defined in 33 U.S.C. § 1362(5).

16.     Defendant CITY OF LOMPOC is a political subdivision of the State of California, a "municipality" as defined in 33 U.S.C. § 1362(4), and a "person" as defined in 33 U.S.C. § 1362(5). Defendant owns and or operates the Facility.

## IV.    STATUTORY BACKGROUND

### Clean Water Act

17.    Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). In the Act, Congress identified the national goal of eliminating "the discharge of pollutants into navigable waters" by 1985. 33 U.S.C. § 1251(a)(1). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharges into the waters of the United States.

18.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

19.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. See 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. See 40 C.F.R. § 120.2.

20.    Section 402(p) of the Act establishes the NPDES program and authorizes the EPA and authorized states to issue permits governing the discharge of pollutants from point sources into waters of the United States.  33 U.S.C. § 1342(p).

21.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator

of the U.S. EPA has authorized California's State Board and nine Regional Boards to issue NPDES permits in California.

22.     Pursuant to Section 307(b)(1) of the Act, the EPA promulgated regulations entitled "General Pretreatment Regulations for Existing and New Sources of Pollution" ("Pretreatment Regulations") that establish pretreatment standards for the introduction of pollutants into a POTW for pollutants determined not to be susceptible to treatment by POTWs or that would interfere with the operation of POTWs. *See* 40 C.F.R. § 403.

23.     Pursuant to Section 307(c) of the Act, the Pretreatment Regulations shall prevent the discharge of any pollutants into a POTW that may interfere with, pass through, or otherwise be incompatible with the POTW. 33 U.S.C. § 1317(c).

24.     Section 307(d) of the Act prohibits any owner or operator of any source from introducing pollutants into a POTW in violation of any effluent standard or prohibition or pretreatment standard promulgated under Section 307 of the Act.

25.     The Pretreatment Regulations also prohibit the introduction of pollutants into POTWs that create fire hazard, are corrosive, will cause obstruction, in any way interfere with the POTW, or will cause a worker health and safety concern.  *See* 40 C.F.R. § 403.5(b).

26.     The Pretreatment Regulations require each POTW with a total design flow greater than 5 million gallons per day ("mgd") and receiving from Industrial Users pollutants that pass through or interfere with the operation of the POTW or are otherwise subject to Pretreatment Standards to establish a POTW Pretreatment Program. *See* 40 C.F.R. § 403.8.

27.     The Pretreatment Regulations require that each POTW developing a POTW Pretreatment Program pursuant to 40 C.F.R. § 403.8 develop and enforce specific limits to implement the prohibitions listed in 40 C.F.R. § 403.5.  A POTW with an approved Pretreatment Program must continue to develop these limits as necessary and must effectively enforce the limits. 40 C.F.R. § 403.5(c)

28.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, partnerships, or municipalities, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5). The Act defines "citizen" as a "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 per day for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

**The NPDES Permit**

29.     The Regional Board issued a NPDES Permit to the City on December 1, 2011, with an effective date of January 13, 2012.  While the NPDES Permit expired on January 13, 2017, its terms remain in effect because, upon information and belief, the City submitted a timely and complete application for a new NPDES permit but a new NPDES permit has not yet taken effect. 40 C.F.R. § 122.6(d); 23 C.C.R. § 2235.4.

30.     The NPDES Permit authorizes the City to discharge pollutants from the

Facility to San Miguelito Creek and the Santa Ynez River subject to certain terms and conditions.

31.     Section IV and Table 6 of the NPDES Permit establish Effluent Limitations applicable to the City's discharges from Discharge Point No. 001, and require effluent to be monitored and reported pursuant to the Monitoring and Reporting Program ("MRP") in Attachment E of the NPDES Permit. NPDES Permit, Section IV and Section VI.B. The Permit provides that a "[d]ischarger shall be deemed out of compliance with effluent limitations if the concentration of the reportable pollutant in the monitoring sample is greater than the effluent limitation and greater than or equal to the reported Minimum Level (ML)."  NPDES Permit, Section VII.A. For Chronic Toxicity, the NPDES Permit contains an effluent limitation of 1.0 TUc (Maximum Daily). *Id*.

32.     The NPDES Permit includes a MRP that requires that "when the chronic toxicity effluent limitation of 1 TUc is exceeded during regular toxicity monitoring, and the testing meets all test acceptability criteria, the Discharger shall initiate accelerated monitoring to confirm the effluent toxicity."  NPDES Permit, Attachment E, p. E-8. Specifically, it states "[t]he Discharger shall implement an accelerated monitoring frequency consisting of performing three toxicity tests in a six-week period following the first failed test results." *Id*.

33.     Section VI.C.2.a of the NPDES Permit requires that when "chronic toxicity is detected in the effluent above the effluent limitations, if the discharge is continuing, the Discharger shall resample immediately, retest, and report the results to the Executive Officer, who will determine whether to initiate an enforcement action,

require a Toxicity Reduction Evaluation (TRE) in accordance with the Discharger's TRE Workplan, or implement other measures." The NPDES Permit requires that "Results of an initial failed test and results of subsequent monitoring shall be reported to the Executive Officer as soon as possible following receipt of monitoring results." *Id*. Section VI.C.2.a of the NPDES Permit states that "[t]he Discharger shall maintain a TRE Workplan, which describes steps that the Discharger intends to follow in the event that a toxicity effluent limitation established by this Order is exceeded in the discharge. The workplan shall be prepared in accordance with current technical guidance and reference material, including EPA/600/2-88/062." *Id*. If a TRE is required, "[t]he TRE shall include all reasonable steps to identify the source of toxicity." *Id*. Once the source of toxicity is identified, "[t]he Discharger shall take all reasonable steps to reduce toxicity to the required level." *Id*.

34.     The NPDES also contains Receiving Water Limitations, which are based on water quality objectives contained in the "Water Quality Control Plan for the Central Coastal Basin," generally referred to as the Basin Plan ("Basin Plan"). *See* https://www.waterboards.ca.gov/centralcoast/publications_forms/publications/basin_plan/. The NPDES Permit prohibits the City from causing or contributing to a violation of the Receiving Water Limitations identified in Section V.A of the NPDES Permit. The NPDES Permit contains a receiving water limit of 100 mg/L (Annual Mean) for sodium, 100 mg/L (Annual Mean) for chloride, and 1,000 mg/L (Annual Mean) for TDS. NPDES Permit, Section V.A.25, Table 25.

35.     The City is required to monitor water quality both upstream and downstream of the Facility's discharge point. The NPDES Permit requires the City to

establish monitoring location RSW-001, located upstream of Discharge Point No. 001, at V Street and Central Avenue. NPDES Permit, Attachment E, p. E-3. The NPDES Permit also requires the City to establish monitoring location RSW-002 approximately 20 yards downstream from Discharge Point No. 001. *Id.*

36.     Section VI.C.b of the NPDES Permit lists the requirements for the Pretreatment Program. It provides that "the Discharger shall be responsible for the performance of all pretreatment requirements contained in 40 C.F.R. 403. . . shall continue to implement and enforce its approved POTW Pretreatment Program . . . [which] is hereby made an enforceable condition of this permit. . . The Discharger shall enforce all requirements promulgated under Sections 307(b), 307(c), 307(d), and 402(b) of the CWA. The Discharger shall cause industrial users subject to Federal Categorical Standards to achieve compliance no later than the date specified in those requirements or, in the case of a new industrial user, upon commencement of the discharge."

37.     Under the NPDES Permit, the City must "perform the pretreatment functions as required in 40 CFR 403." NPDES Permit Section VI.C.5.b. This includes, but is not limited to, the requirement to: "i) [i]mplement the necessary authorities as provided in 40 CFR 403.8(f)(1); ii) [e]nforce the pretreatment requirements under 40 CFR 403.5 and 403.6; iii) implement the programmatic functions as provided in 40 CFR 403.8(f)(2); and iv) [p]rovide the requisite funding and personnel to implement the pretreatment program as provided in 40 CFR 403.8(f)(3)." NPDES Permit, Section VI.C.b.

38.     The NPDES Permit requires that the City "at all times properly operate

and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Discharger to achieve compliance with the conditions of this Order." NPDES Permit, Attachment D Section I.D.

## V.    STATEMENT OF FACTS

39.    Defendant owns and operates the Facility, which is a municipal wastewater collection, treatment, and disposal facility that discharges tertiary treated wastewater in Lompoc, California.

40.    Defendant has owned and operated the Facility since prior to February 24, 2016.

41.    The Facility provides service to approximately 53,050 municipal and industrial users from the City of Lompoc, Vandenberg Air Force Base ("VAFB"), and Vandenberg Village Community Services District ("VVCSD"). The wastewater generated from the service area is approximately ninety percent domestic and ten percent from commercial, light industrial, and military sources. NPDES Permit, Attachment F, F-4.

42.    The Facility's design average dry weather flow capacity is 5.5 million gallons per day.

43.    The Facility's wastewater handling and treatment system includes mechanical bar screens, an aerated grit tank, two parallel oxidation ditches, three secondary clarifiers, tertiary filters, and UV disinfection. Sludge handling includes two dissolved air flotation thickeners, aerobic sludge digesters, two sludge lagoons, drying beds, and offsite disposal. The Facility also maintains an emergency retention basin for use during events of disinfection maintenance, spills, and other emergency

situations.

44.     Treated wastewater from the Facility is discharged from an outfall designated "Discharge Point No. 001." Plaintiff is informed and believes, and thereupon alleges, that during dry weather or times of low flow, wastewater discharged from Discharge Point No. 001 discharges into San Miguelito Creek, a tributary of the Santa Ynez River, approximately 400 yards upstream of the confluence with the River. Plaintiff is informed and believes, and thereupon alleges, that during times of high flow, wastewater discharged from Discharge Point No. 001 discharges directly into the Santa Ynez River, which continues for approximately 7.5 miles to the Pacific Ocean.  The Facility's receiving waters include areas of the San Miguelito Creek and Santa Ynez river impacted by the discharges (collectively, "Facility Receiving Waters").

45.     Plaintiff is informed and believes, and thereupon alleges, that the Facility discharges directly to the Santa Ynez River during high flows, when the River overflows its banks to combine with San Miguelito Creek.

46.     The City monitors pollution levels in the Facility's effluent at Monitoring Location EFF-001.  Discharge Point No. 001 and Monitoring Location EFF-001 are the same location.

47.     San Miguelito Creek and the Santa Ynez River are waters of the United States.

48.     On September 2, 2020, the EPA entered into an AOC with the City regarding the Facility's ongoing violations of the Clean Water Act, though it does not cover all legal claims included in this Complaint. Moreover, the AOC does not assess

any civil penalties against the City.

### **Violations of Effluent Limits**

49.     The Facility has detected chronic toxicity levels exceeding the Effluent Limitation of 1.0 TUc for EFF-001 established by the NPDES Permit in nearly every sample taken by the City since at least February 24, 2016.  Discharges measured at Monitoring Location EFF-001 caused chronic toxicity in excess of the NPDES Permit's maximum daily effluent limitations for chronic toxicity of 1 TUc on the following dates: December 7, 2020; October 13, 2020; October 7, 2020; February 12, 2020; January 13, 2020; November 13, 2019; October 16, 2019; September 11, 2019; July 17, 2019; June 5, 2019; April 17, 2019; February 20, 2019; January 16, 2019; October 17, 2018; July 31, 2018; July 19, 2018; May 16, 2018; April 11, 2018; March 16, 2018; January 30, 2018; December 13, 2017; October 11, 2017; July 26, 2017; May 31, 2017; April 19, 2017; March 15, 2017; January 18, 2017; November 16, 2016; October 12, 2016; September 14, 2016; August 24, 2016; July 19, 2016; May 31, 2016; May 4, 2016; March 2, 2016.

50.     Plaintiff is informed and believes, and thereupon alleges, that the City's exceedances of the chronic toxicity effluent standard have resulted in actual harm to the environment surrounding the outfall by producing detrimental physiological responses in aquatic life.

51.     Plaintiff is informed and believes, and thereupon alleges, that violations have suppressed algal growth, caused algal population reduction, and reduced dissolved oxygen production over a continuous period of at least five years, thereby harming the ecological integrity of the receiving waters below the discharge point and

impairing their beneficial use.

52.    Plaintiff is informed and believes, and thereupon alleges, that on each of the following dates, the chronic toxicity effluent exceeded 1 TUc and triggered accelerated monitoring. The City did not perform three additional toxicity tests in a six-week period for the following dates of violation of the chronic toxicity effluent limitation: December 7, 2020; October 13, 2020; October 7, 2020; February 12, 2020; January 13, 2020; November 13, 2019; October 16, 2019; September 11, 2019; July 17, 2019; June 5, 2019; April 17, 2019; February 20, 2019; January 16, 2019; October 17, 2018; July 31, 2018; July 19, 2018; May 16, 2018; April 11, 2018; March 14, 2018; January 30, 2018; December 13, 2017; October 11, 2017; August 31, 2017; July 26, 2017; May 31, 2017; April 19, 2017; March 15, 2017; January 18, 2017; November 16, 2016; October 12, 2016; July 19, 2016; May 31, 2016; May 4, 2016; March 2, 2016.

## **Violations of Receiving Water Limitations**

53.    Plaintiff is informed and believes, and thereupon alleges, that on every day that there was no flow upstream of the Facility on San Miguelito Creek at RSW-001, during years where the average annual levels of these pollutants at EFF-001 and/or RSW-002 exceeded the NPDES Permit's receiving water limits, the City violated the Receiving Water Effluent Limitations for sodium, chloride, and TDS.

54.    Table 1, below, lists time periods during which the United States Geological Survey measured no flow at its flow gauge labeled "USGS 11133000 SANTA YNEZ R A NARROWS NR LOMPOC CA" located just upstream of Lompoc at the Santa Ynez River Narrows. Plaintiff is informed and believes, and

thereupon alleges, that flows within San Miguelito Creek at RSW-001 also did not occur on at least these dates:

**Table 1: Dates of No Flow Upstream of Facility.**

| |
|---|
| January 1 – January 27, 2021 |
| June 27 – December 31, 2020 |
| January 1 – March 9, 2020 |
| January 29 – December 31, 2019 |
| January 1 – January 5, 2019 |
| October 9 – December 31, 2018 |
| May 28 – August 19, 2018 |
| June 26 – September 2, 2017 |
| January 1 – January 19, 2017 |
| September 20 – December 31, 2016 |
| February 24 – July 31, 2016 |

55.     Plaintiff is informed and believes, and thereupon alleges, that to the extent there were additional dates on which no flow occurred in San Miguelito Creek at RSW-001, the City violated the NPDES Permit's receiving water limitation for chloride, sodium, and TDS on each of those days as well, for periods during which annual averages at EFF-001 exceeded the receiving water limits applicable at RSW-002.

56.     Plaintiff is informed and believes, and thereupon alleges, that for each year from 2016 through the date of this Complaint, the average annual effluent concentration of sodium discharged from the Plant at EFF-001 exceeded the numeric receiving water limitation of 100 mg/l annual mean. The average annual effluent concentration measured at EFF-001 and reported by the City are set forth in Table 2 below.

**Table 2: Annual Mean Concentrations of Sodium at EFF-001 in Excess of Receiving Water Limitation.**

| | |
|---|---|
| 12 month avg as of 10/7/2020 | 185 mg/L |
| 12 month avg as of 7/8/2020 | 177 mg/L |
| 12 month avg as of 4/1/2020 | 188 mg/L |
| 12 month avg as of 1/15/2020 | 194 mg/L |
| 12 month avg as of 7/9/2019 | 210 mg/L |
| 12 month avg as of 4/17/2019 | 208 mg/L |
| 12 month avg as of 3/31/2019 | 206 mg/L |
| 12 month avg as of 12/31/2018 | 204.5 mg/L |
| 12 month avg as of 1/29/2018 | 194 mg/L |
| 12 month avg as of 7/26/2018 | 202 mg/L |
| 12 month avg as of 10/10 2017 | 206 mg/L |
| 12 month avg as of 07/18/2017 | 202 mg/L |
| 12 month avg as of 04/19/2017 | 217 mg/L |
| 12 month avg as of 01/11/2017 | 198 mg/L |
| 12 month avg as of 12/31/2016 | 234 mg/L |
| 12 month avg as of 07/12/2016 | 242 mg/L |
| 12 month avg as of 06/30/2016 | 240 mg/L |
| 12 month avg as of 03/31/2016 | 239 mg/L |

57.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused exceedances of the sodium receiving water limitation on each of the 1,138 days in the periods set forth in Table 1 where the Facility's effluent was not diluted or mixed with any creek flows. Plaintiff is further informed and believes, and thereupon alleges that the Facility's effluent discharge caused or contributed to violations of the sodium receiving water limitation at RSW-002 on each and every period during which sodium was detected upstream of the Facility at RSW-001 below the receiving water limitation of 100 mg/L, but where sodium was measured above 100 mg/L downstream of the Facility at RSW-002.

58.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused or contributed to violations of the sodium

receiving water limitation at RSW-002 on each and every day during periods where the Facility's annual average sodium levels measured at EFF-001 exceeded 100 mg/L on each day where the Facility's effluent dominated the flow rate at RWS-002, including every day that the effluent flow from EFF-001 exceeded creek flows at RSW-001.

59.    Plaintiff is informed and believes, and thereupon alleges, that for each year from 2016 through the end of 2020, the average annual effluent concentration of chloride discharged from the Plant at EFF-001 exceeded the numeric receiving water limitation of 100 mg/l annual mean. The average annual effluent concentrations measured at EFF-001 and reported by the City are set forth in Table 3 below.

**Table 3: Annual Mean Concentrations of Chloride at EFF-001 in Excess of Receiving Water Limitation.**

| | |
|---|---|
| 12 month avg as of 10/23/2020 | 186 mg/L |
| 12 month avg as of 7/24/2020 | 183 mg/L |
| 12 month avg as of 4/17/2020 | 184 mg/L |
| 12 month avg as of 1/24/2020 | 188 mg/L |
| 12 month avg as of 10/16/2019 | 185 mg/L |
| 12 month avg as of 7/9/2019 | 192 mg/L |
| 12 month avg as of 4/29/2019 | 192 mg/L |
| 12 month avg as of 3/31/2019 | 195 mg/L |
| 12 month avg as of 12/31/2018 | 194 mg/L |
| 12 month avg as of 7/23/2018 | 201 mg/L |
| 12 month avg as of 1/10/2018 | 180 mg/L |
| 12 month avg as of 10/16/2017 | 188 mg/L |
| 12 month avg as of 7/20/2017 | 191 mg/L |
| 12 month avg as of 4/19/2017 | 201 mg/L |
| 12 month avg as of 1/23/2017 | 183 mg/L |
| 12 month avg as of 12/31/2016 | 222 mg/L |
| 12 month avg as of 7/21/2016 | 223 mg/L |
| 12 month avg as of 6/30/2016 | 230 mg/L |

| 12 month avg as of 3/31/2016 | 230 mg/L |
|---|---|

60.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused exceedances of the chloride receiving water limitation on each of the 1,138 days in the periods set forth in Table 1 where the Facility's effluent was not diluted or mixed with any creek flows. Plaintiff is further informed and believes, and thereupon alleges that, the Facility's effluent discharge caused or contributed to violations of the chloride receiving water limitation at RSW-002 on each and every period during which chloride was detected upstream of the Facility at RSW-001 below the receiving water limitation of 100 mg/L, but where chloride was measured above 100 mg/L downstream of the Facility at RSW-002.

61.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused or contributed to violations of the chloride receiving water limitation at RSW-002 on each and every day during periods where the Facility's annual average chloride levels measured at EFF-001 exceeded 100 mg/L on each day where the City's effluent dominated the flow rate at RWS-002, including every day that the effluent flow from EFF-001 exceeded creek flows at RSW-001.

62.     Plaintiff is informed and believes, and thereupon alleges that, for each year from 2016 through the end of 2017, the average annual effluent concentration of TDS discharged from the Facility at EFF-001 exceeded the numeric receiving water limitation of 100 mg/l annual mean.  The average annual effluent concentration measured at EFF-001 are set forth in Table 4 below.

**Table 4: Annual Mean Concentrations of TDS at EFF-001 in Excess of Receiving Water Limitation.**

| 12-month average as of 7/20/2017 | 1019 mg/L |
|---|---|
| 12-month average as of 04/19/2017 | 1051 mg/L |

| 12-month average as of 01/18/2017 | 1004 mg/L |
|---|---|
| 12-month average as of 12/31/2016 | 1073 mg/L |
| 12-month average as of 07/20/2016 | 1073 mg/L |
| 12-month average as of 06/30/2016 | 1078 mg/L |
| 12-month average as of 03/31/2016 | 1070 mg/L |

63.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused exceedances of the TDS receiving water limitation on each of the 1,138 days in the periods set forth in Table 1 where the Facility's effluent was not diluted or mixed with any creek flows. Plaintiff is further informed and believes, and thereupon alleges that the Facility's effluent discharge caused or contributed to violations of the TDS receiving water limitation at RSW-002 on each and every period during which TDS was detected upstream of the Facility at RSW-001 below the receiving water limitation of 1,000 mg/L, but where TDS was measured above 1,000 mg/L downstream of the Facility at RSW-002.

64.     Plaintiff is informed and believes, and thereupon alleges, that the Facility's effluent discharge caused or contributed to violations of the TDS receiving water limitation at RSW-002 on each and every day during periods where the Facility's annual average TDS levels measured at EFF-001 exceeded 1,000 mg/L on each day where the Facility's effluent dominated the flow rate at RWS-002, including every day that the effluent flow from EFF-001 exceeded creek flows at RSW-001.

65.     Plaintiff is informed and believes, and thereupon alleges, that the City's violations of the Effluent and Receiving Water Limitations of the NPDES Permit are ongoing.

66.     Information available to Plaintiff indicates that as a result of these practices, every day, effluent containing excessive pollutants is being discharged from

the Facility into San Miguelito Creek and the Santa Ynez River.

**Pretreatment Violations**

67.     The City's "Sewer System Ordinance of the City of Lompoc" ("Sewer Use Ordinance" or "SUO") applies "to the discharge of all wastes to the City's sewerage system, and shall provide for regulation of wastewater discharge in accordance with 40 CFR Part 403.2., Objectives of General Pretreatment Regulations." Lompoc Municipal Code Section 13.16.020.

68.     Plaintiff is informed and believes, and thereupon alleges, that the City's Sewer Use Ordinance – the City's Pretreatment Program – does not comply with all pretreatment requirements contained in 40 CFR 403.

69.     Plaintiff is informed and believes, and thereupon alleges, that since at least February 24, 2016, the City failed to perform all pretreatment requirements provided in 40 CFR 403 and failed to develop, implement, and enforce its approved Pretreatment Program in compliance with the Clean Water Act.

70.     Plaintiff is informed and believes, and thereupon alleges, that since at least February 24, 2016, the City's Sewer Use Ordinance has violated the following Pretreatment Regulations:

A.     40 C.F.R. § 403.8(f)(1)(i): The SUO does not provide the City with authority to deny or condition new or increased contributions to the City's POTW.

B.     40 C.F.R. § 403.5(b)(1) and 40 C.F.R. § 403.8(f)(1)(ii): The SUO does not include all specific prohibitions in 40 CFR § 403.5(b).

C.     40 C.F.R. § 403.8(f)(1)(vi)(A): The SUO and Enforcement Response Plan ("ERP") contain conflicting penalty amounts.

D.     40 C.F.R. § 403.8(f)(5): The SUO does not provide the City the legal authority to enforce its ERP.

E.     40 C.F.R. § 403.8(f)(3): The City has failed to provide sufficient funding and personnel to implement an effective pretreatment program.

F.     40 C.F.R. § 403.12(c): The SUO does not require industrial users ("IUs") to submit compliance scheduled progress reports.

G.     40 C.F.R. § 403.12(h): The SUO does not require non-categorical significant industrial users ("SIUs") to submit periodic reports.

H.     40 C.F.R. § 403.12(e): The SUO does not require categorical IUs to submit periodic reports.

I.     40 C.F.R. § 403.8(g)(2): The SUO does not require IUs to notify the City of a violation nor does it require the IU to resample following a violation.

J.     40 C.F.R. § 403.12(g)(6): The SUO does not require IUs to submit all monitoring data.

K.     40 C.F.R. § 403.12(g)(3): The SUO does not require samples to be representative of the discharge.

L.     40 C.F.R. § 403.12(l)(1): The SUO does not require IUs to certify that the data submitted to the City is accurate with a signature from an authorized representative.

M.     40 C.F.R. § 403.8(f)(2)(vi): The SUO does not require IUs to notify the city of changes affecting the potential for slug discharge, and the City has not evaluated the need for SIUs to develop slug discharge control plans.

N.     40 C.F.R. § 403.8(f)(1)(iii)(B)(6): The SUO does not provide legal

authority to include slug discharge control plan requirements in SIU permits.

O.      40 C.F.R. § 403.12(o)(1) and 40 C.F.R. § 403.12(o)(2): The SUO does not require IUs to retain records for at least three years.

P.      40 C.F.R. § 403.12(f): The SUO does not require SIUs to immediately notify the City of potential problems, including slug loads.

Q.      40 C.F.R. § 403.5(a), (b), and (c): The SUO does not establish local limits for Biochemical Oxygen Demand and total suspended solids ("TSS").

R.      40 C.F.R. § 403.8(f)(2)(iv); 40 C.F.R. § 403.12; 40 C.F.R. § 403.8(g): The City is accepting required reports that do not contain wet-ink signatures, and the City is not authorized to accept electronic submissions.

S.      40 C.F.R. § 403.3(m): The SUO does not define the term "new source."

T.      40 C.F.R. § 403.3(e): The SUO does not define the term "best management practices (BMPs)."

U.      40 C.F.R. § 403.8(f)(2)(viii): The SUO does not define the term "significant non-compliance" in a manner that meets minimum federal requirements.

V.      40 C.F.R. § 403.8(f)(2)(vi):  The SUO does not define the term "slug load" in a manner that meets minimum federal requirements.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Effluent Limitations**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

72.    Plaintiff is informed and believes, and thereupon alleges, that since at least February 24, 2016, the City has discharged and continues to discharge pollutants into San Miguelito Creek and the Santa Ynez River in excess of the NPDES Permit's effluent limitations for chronic toxicity.

73.    Plaintiff is informed and believes, and thereupon alleges, that the City has violated the NPDES Permit's chronic toxicity effluent limitations at least 35 times since February 24, 2016.

74.    Each day since February 24, 2016 that the City's discharges of pollutants exceeded levels authorized by the NPDES Permit is a separate and distinct violation of the NPDES Permit's effluent limitation and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The City's violations are continuous and ongoing.

## SECOND CAUSE OF ACTION

### Failure to Comply with Toxicity

### Monitoring Requirements

### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

75.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

76.    The NPDES Permit requires that when a chronic toxicity effluent limitation is exceeded during regular toxicity monitoring, the City must implement an accelerated monitoring frequency consisting of performing three toxicity tests in a six-week period following the first failed test result. NPDES Permit, Attachment E,

Section V.D.

77.     Plaintiff is informed and believes, and thereupon alleges, that the City has exceeded the chronic toxicity effluent limitation, requiring accelerated monitoring, but that the City did not perform three additional toxicity tests in a six-week period following the first failed test in violation of Attachment E, Section V.D of the NPDES Permit.

78.     Each time since February 24, 2016, that the City was required to, but did not, conduct three additional toxicity tests in a six-week period following a failed test pursuant to Attachment E, Section V.D of the NPDES Permit is a separate and distinct violation of the NPDES Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## THIRD CAUSE OF ACTION

### Violations of Receiving Water Limitations

### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

79.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

80.     Receiving Water Limitation V.A.25 provides that the City's wastewater discharges shall not cause receiving water to exceed specified numeric water quality objectives for TDS, chloride, and sodium of, respectively, 1,000 mg/L, 100 mg/L, and 100 mg/L measured as an annual mean. Plaintiff is informed and believes, and thereupon alleges, that since at least February 24, 2016, Defendant has been discharging polluted wastewater from the Facility in excess of the numeric water

quality objectives for TDS, chloride, and sodium in violation of Receiving Water Limitation V.A.25 and Discharge Prohibition III.E of the NPDES Permit.

81.     Every day since at least February 24, 2016 that Defendant has discharged and continues to discharge polluted wastewater from the Facility in violation of the NPDES Permit's Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION

**Failure to Develop, Implement, and Enforce**

**an Adequate Pretreatment Program**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

83.     Section VI.C.5.b of the NPDES Permit requires the City to develop, implement, and enforce a Pretreatment Program that complies with all pretreatment requirements contained in 40 CFR § 403.

84.     Defendant has failed to develop, implement, and enforce an adequate Pretreatment Program for the Facility that complies with all pretreatment requirements contained in 40 CFR 403 as described above in paragraphs 78.A-78.V.

85.     Each day since February 24, 2016, that the City has failed to develop, implement, and enforce a Pretreatment Program that complies with 40 CFR § 403 is a separate and distinct violation of the NPDES Permit and Section 301(a) of the Act, 33

U.S.C. § 1311(a). These violations are ongoing and continuous.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act and the NPDES Permit as alleged herein;

b.   Enjoin Defendant from further violating the substantive and procedural requirements of the NPDES Permit;

c.   Order Defendant to comply with the NPDES Permit's toxicity monitoring requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

d.   Order Defendant to develop, implement, and enforce a Pretreatment Program consistent with the NPDES Permit's requirements;

e.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

f.   Order Defendant to pay civil penalties of up to $55,800 per day for violations, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

g.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

h.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

§ 1365(d); and,

            i.  Award any such other and further relief as this Court may deem appropriate.

Dated: February 24, 2021           Respectfully submitted,


By:   /s/*Rebecca L. Davis*
        Rebecca L. Davis
        LOZEAU DRURY LLP
        Attorneys for Environmental Defense Center


ENVIRONMENTAL DEFENSE CENTER

 /s/ *Linda Krop*  (as authorized on 02/24/21)
      Linda Krop

 /s/ *Tara Messing* (as authorized on 02/24/21)
      Tara Messing